# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

     **v.**                        **Case No. 18-20027-JAR**

**ERIK M. HUSETH,**

     **Defendant.**

## MEMORANDUM AND ORDER ON SENTENCING

On August 27, 2018, Defendant Erik Huseth pled guilty to Count 3 of a three-count Information, charging him with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  The charges stemmed from the FBI's search and seizure of Huseth's computer in 2014, which contained child pornography images and videos.  This matter is now before the Court on Huseth's Sentencing Memorandum and Motion for Downward Departure or Variance (Doc. 31).

Neither party objects to the Sentencing Guidelines calculations in the Presentence Investigation Report.  The calculations are: a base offense level of 18, a two-level enhancement for knowingly engaging in distribution via the use of peer-to-peer software, a two-level enhancement for use of a computer, a two-level enhancement for materials involving prepubescent minors, a four-level enhancement for materials depicting the sexual exploitation of infants or toddlers, a five-level enhancement for possessing more than 600 images, and a three-level reduction for acceptance of responsibility.  The total offense level is 30, and Huseth's criminal history category is I, resulting in a correctly calculated Guidelines range of 97 to 120 months.

Huseth seeks a substantial departure downward under U.S.S.G. § 5H1.4 (Physical Condition) and a substantial variance downward on the basis of his lifelong condition of Autism Spectrum Disorder ("ASD"), his significant cognitive impairments, his particularized vulnerability, and his need for treatment.  Huseth requests a sentence of probation, with any conditions the Court finds appropriate.

The government advocates for a two-level downward variance in recognition of this Court's prior rulings that the two-level enhancement for use of a computer is no longer a distinguishing specific offense characteristic in an age when virtually all such crimes are committed through the use of a computer.[1]  The government thus advocates for a sentence of 78 months, the bottom of the Guidelines range of 78 to 97 months for a total offense level of 28 and criminal history category of I.

In the three years since Huseth pled guilty, the parties have engaged in extensive discovery concerning Huseth's ASD and whether he has Pedophilic Disorder.  The parties have obtained evaluations, diagnoses, reports, and testimony from experts and have presented evidence at several sentencing hearings.  The Court has the benefit of the opinions of five experts.  Sarah Dettmer, a psychologist, has treated Huseth since 2013 for ASD.  Defense expert Dr. Rachel Loftin, a psychologist who specializes in ASD, did extensive testing of Huseth and his parents and a comprehensive evaluation.  Defense expert Dr. George Athey, a neuropsychologist who specializes in treatment of sex offenders, tested and evaluated Huseth and concluded that Huseth does not have Pedophilic Disorder.  The government's experts, Dr. Eric Imhof and Dr. Kimberly Spence, interviewed Huseth and reviewed the reports of Dr. Loftin

---

[1] *See* U.S. Sent'g Comm'n, Federal Sentencing of Child Pornography Non-Production Offenses 9 (2021).

and Dr. Athey.  Dr. Spence opined that Huseth has ASD.  Dr. Imhof opined that Huseth has Pedophilic Disorder.

There is no dispute that Huseth has ASD, but there is a dispute about the degree of his impairment and the degree to which it impaired his ability to fully appreciate the wrongfulness of possessing and viewing child pornography.  There is also a dispute about whether Huseth has Pedophilic Disorder.

The Court has carefully reviewed the testimony and exhibits, the Presentence Investigation Report, as well as the many memoranda and pleadings filed by the parties.[2]  Based on this extensive record, the Court concludes that Huseth's ASD and associated severe cognitive deficits significantly impaired his ability to fully appreciate the wrongfulness of possessing and viewing child pornography.  Though Huseth understood enough to justify a plea to knowingly and intentionally possessing child pornography, he is not a neurotypical person and, without any explicit explanation, could not fully appreciate that the children involved were horrifically abused physically, mentally, and emotionally.  Huseth's ASD further renders him particularly vulnerable to bullying and worse injury in a prison environment.

And, having carefully weighed the testimony and opinions of the experts, the Court finds that Huseth does not have Pedophilic Disorder.  Nonetheless, the Court concludes that a probation sentence with treatment and therapeutic conditions tailored to his ASD as well as to sex offenders who are pedophilic constitutes a sentence that is sufficient but not greater than necessary to satisfy the statutory sentencing purposes set forth in 18 U.S.C. § 3553(a).  For all

---

[2] The record includes: Huseth's Sealed Sentencing Memorandum and Motion for Downward Departure or Variance (Doc. 31); the government's Response to Defendant's Sentencing Memorandum. (Doc. 35); Huseth's Reply to the Government's Sentencing Memorandum (Doc. 63); Huseth's Supplemental Sentencing Information: Sentencing Data in Autism-Related Child Pornography Cases (Doc. 67); and the government's Sur-Reply to Defendant's Reply to Government's Sentencing Memorandum (Doc. 68).

these reasons, pursuant to § 3553(a), the Court finds that a substantial downward variance is

warranted, as explained more fully below.

## I.     Legal Standard

After *United States v. Booker*,[3] district courts are no longer required to impose a

Guidelines sentence.  The Guidelines should still be "the starting point and the initial

benchmark,"[4] but "district courts may impose sentences within statutory limits based on

appropriate consideration of all the factors listed in [18 U.S.C.] § 3553(a)."[5]  That statute

provides:

> The court shall impose a sentence sufficient, but not greater than
> necessary, to comply with the purposes set forth in paragraph (2)
> of this subsection.  The court, in determining the particular
> sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
> (2) the need for the sentence imposed--
>> (A) to reflect the seriousness of the offense, to promote
>> respect for the law, and to provide just punishment for the
>> offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the
> defendant; and
>> (D) to provide the defendant with needed educational or
>> vocational training, medical care, or other correctional
>> treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence[s] and the sentencing range established
> for . . . the applicable category of offense committed by the
> applicable category of defendant as set forth in the guidelines . . . ;
> (5) any pertinent policy statement . . . issued by the Sentencing
> Commission . . . ;
> (6) the need to avoid unwarranted sentence disparities among
> defendants with similar records who have been found guilty of
> similar conduct; and

---

[3] 543 U.S. 220 (2005).

[4] *Pepper v. United States*, 562 U.S. 476, 490 (2011) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).

[5] *Id.*

(7) the need to provide restitution to any victims of the offense.[6]

In determining whether a defendant is entitled to a variance, a district court "should engage in a holistic inquiry of the § 3553(a) factors."[7]  The court "must consider the extent of the deviation [from the Guidelines] and ensure that the justification is sufficiently compelling to support the degree of the variance."[8]  "A 'major' variance should have 'a more significant justification than a minor one.'"[9]  That said, the Supreme Court has rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range" and "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence."[10]

## II.     Analysis

### A.     Nature, Circumstances, and Seriousness of the Offense

In June 2014, an FBI task force officer used a computer to launch a law enforcement version of a peer-to-peer software to search for IP addresses offering to share files containing child pornography.  On June 29, 2014, the officer downloaded a partial file from Huseth's computer, but the file did not meet the definition of child pornography.  From July 4 to August 10, 2014, the officer downloaded from Huseth's computer numerous images and video files containing child pornography.

In November 2014, the FBI executed a search warrant at Huseth's residence, seizing his computer and related equipment.  Huseth had a collection of 271 child pornography videos and

---

[6] 18 U.S.C. § 3553(a).

[7] *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014) (quoting *United States v. Lopez-Macias*, 661 F.3d 485, 492 (10th Cir. 2011)).

[8] *Id.* (alteration in original) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).

[9] *Id.* (quoting *Gall*, 522 U.S. at 50).

[10] *Id.* (quoting *Gall*, 552 U.S. at 47).

12,198 child pornography images.  While these numbers may seem extreme, they are not.  In June 2021, the U.S. Sentencing Commission issued a report titled, *Federal Sentencing of Child Pornography Non-Production Offenses*, which updates and expands upon its 2012 child pornography report.[11]  Among its key findings was that in fiscal year 2019 ("FY 2019"), "non-production child pornography offenses involved a median number of 4,265 images, with some offenders possessing and distributing millions of images and videos."[12]  The Sentencing Commission also found that 95.4% of defendants convicted of non-production possession of child pornography received an enhancement for having 600 or more images.[13]  The Sentencing Commission explained that, "[f]acilitated by advancements in digital and mobile technology, non-production child pornography offenses increasingly involve voluminous quantities of videos and images that are graphic in nature, often involving the youngest victims."[14]

Huseth's child pornography collection included images and videos of infants, toddlers, prepubescent minors, and teenage girls, some of which depicted sadistic or masochistic conduct.  Sadly, this material is typically found in the collections of those convicted of non-production child pornography offenses.  In FY 2019, 52.2% of defendants convicted of non-production child pornography offenses had images or videos of infants or toddlers, and 99.4% had images of prepubescent victims.[15]  Further, 96.3% of defendants convicted of non-production possession of child pornography received an enhancement for images depicting victims under 12 years old, and

---

[11] *See* U.S. Sent'g Comm'n, *supra* note 1.

[12] *Id.* at 4.  Huseth was convicted of the offense that the Sentencing Commission categorizes as non-production possession of child pornography.  The Sentencing Commission's report categorizes two other non-production offenses: receipt of child pornography and distribution of child pornography.  *See id.* at 1.

[13] *Id.* at 19.

[14] *Id.* at 4.

[15] *Id.*

78.6% of such defendants received an enhancement for images depicting sadistic or masochistic conduct or abuse of an infant or toddler.[16]  These enhancements, in the Sentencing Commission's view, "cover conduct so ubiquitous that they now apply in the vast majority of cases sentenced under § 2G2.2."[17]

The nature and circumstances of Huseth's offense are quite typical when compared to other defendants convicted of non-production possession of child pornography.  The majority of these cases involve voluminous quantities of images and videos, victims under the age of 12 or prepubescent minors, images depicting sadistic and masochistic conduct, and the use of a computer—all of which are specific offense enhancements under the Guidelines.[18]

At the same time, certain aggravating circumstances are not present in this case.  The Sentencing Commission found that participation in an online community devoted to child pornography and engagement in sexual conduct with a child prior to or concurrently with the offense are aggravating factors that the Guidelines fail to adequately account for.[19]  In FY 2019, 43.7% of non-production child pornography offenders participated in an online child pornography community,[20] and 48% engaged in aggravating sexual conduct prior to or concurrently with the offense.[21]  There is no evidence that Huseth participated in any online child pornography community or engaged in sexual conduct with a child during or prior to the offense.

---

[16] *Id.* at 19.

[17] *Id.* at 4.

[18] *See id.* at 19.  Moreover, close to 40% of defendants convicted of non-production possession of child pornography received a two-level distribution enhancement.  *See id.*

[19] *Id.* at 6.

[20] *Id.* at 38.

[21] *Id.* at 40–41.

Nor is there evidence that Huseth specifically sought out images depicting infants or toddlers, or images depicting sadistic or masochistic conduct. Huseth frequently used the search term "PTHC," which is an acronym for "Preteen Hard Core." But Huseth did not know what PTHC stood for. And he did not search for particular ages or age groups either; instead, he searched by series name, which sometimes included the age of the child (most commonly 12 years old).

The typicality of the circumstances of Huseth's offense in no way diminishes the seriousness of this offense. The Court considers this offense extremely serious. The acquisition and possession of child pornography creates market demand for the horrific sexual assault and exploitation of children, and it causes these children continuing harm as these horrific images continue to be distributed, shared, and viewed.

## B.   History and Characteristics of the Defendant

The Court has an extensive record of Huseth's history and characteristics, documented in educational and medical records relied upon by the experts who treated, evaluated, and/or assessed Huseth, and who produced comprehensive reports of their findings. Huseth retained Rachel Loftin, Ph.D., a psychologist who specializes in evaluating and treating individuals with ASD. Dr. Loftin is the Clinical Director of the Autism Assessment, Research and Treatment Center at Rush University Medical Center. Huseth also offered the reports of his treating psychologist, Sarah Dettmer, M.S.Ed., M.S., LPC, LCPC, who specializes in counseling people with ASD and has 22 years of experience in the field. Ms. Dettmer has treated Huseth for ASD in individual and group therapy since 2013, before he was apprehended by law enforcement in this case. The government offered the testimony of Kimberly Spence, Ph.D., an ASD specialist

who works with Dr. Eric Imhof at Specialized Treatment and Assessment Resources, P.A. in

Florida.

### 1.       Autism Spectrum Disorder

Dr. Loftin, Dr. Spence, and Ms. Dettmer all agree that Huseth has ASD, a lifelong

neurodevelopmental disorder that presents in early childhood.  According to the Diagnostic and

Statistical Manual of Mental Disorders:

> Autism spectrum disorder is characterized by persistent
> deficits in social communication and social interaction across
> multiple contexts, including deficits in social reciprocity,
> nonverbal communicative behaviors used for social interaction,
> and skills in developing, maintaining, and understanding
> relationships.  In addition to the social communication deficits, the
> diagnosis of autism spectrum disorder requires the presence of
> restricted, repetitive patterns of behavior, interests, or activities.
> Because symptoms change with development and may be masked
> by compensatory mechanisms, the diagnostic criteria may be met
> based on historical information, although the current presentation
> must cause significant impairment.
>
> Within the diagnosis of autism spectrum disorder,
> individual clinical characteristics are noted through the use of
> specifiers (with or without accompanying intellectual impairment;
> with or without accompanying structural language impairment;
> associated with a known medical or genetic condition or
> environmental factor; associated with another neurodevelopmental,
> mental, or behavioral disorder), as well as specifiers that describe
> the autistic symptoms (age at first concern; with or without loss of
> established skills; severity).  These specifiers provide clinicians
> with an opportunity to individualize the diagnosis and
> communicate a richer clinical description of the affected
> individuals.  For example, many individuals previously diagnosed
> with Asperger's disorder would now receive a diagnosis of autism
> spectrum disorder without language or intellectual impairment.[22]

Ms. Dettmer has been treating Huseth for ASD since 2013.  Dr. Spence relied on Dr.

Loftin's thorough evaluation of Huseth and the raw data in concluding that Huseth has ASD.  In

---

[22] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders: DSM-5 31–32 (5th ed. 2013).

her comprehensive evaluation, Dr. Loftin administered the Scales of Independent Behavior, Revised ("SIB-R") to Huseth's parents, which is "an individual assessment of adaptive behavior, which can be defined as day-to-day activities necessary to take care of oneself and get along with others."[23]  Dr. Loftin also administered multiple tests to Huseth: Autism Diagnostic Observation Schedule ("ADOS2"), Minnesota Multiphasic Personality Inventory ("MMPI-2"), Test of Problem Solving ("TOPS-3"), Wechsler Adult Intelligence Scale ("WAIS-IV"), and Millon Clinical Multiaxial Inventory ("MCMI-III").

Based on her evaluation, Dr. Loftin offered an extensive opinion about the severity of Huseth's ASD and how it affects his behavior.  She found:

> Mr. Huseth can appear as rather typical.  He is bright, has a good vocabulary and has no visible disabilities.  Despite outward appearances of normalcy, Mr. Huseth has very significant social and adaptive skills deficits.  His ability to operate in social contexts and to care for himself are substantially delayed.  In many key contexts (including making inferences in social situations, caring for a home, preparing his meals, and social interaction in community settings), he is functioning on the level of an 8-year[-]old child.

> Mr. Huseth clearly meets the diagnostic criteria for Autism Spectrum Disorder (ASD).  Deficits in social-communication and the presence of atypical behaviors associated with autism were evident from early childhood.  Social-communication deficits, particularly making inferences about social behavior, are severe.  There are limits in his ability to think about his social relationships.  He can provide definitions of certain relationships but struggles when asked about others' experiences.  He presents as very socially naïve and lacks knowledge about how to behave in social interaction.  Mr. Huseth has a long history of intense preoccupations with particular topics, and these preoccupations can interfere with social engagement.  There is also a history of insistence on verbal rituals, repetitive behaviors, and unusual sensory seeking behaviors in early childhood (sniffing people, mouthing), and behavioral rigidity.  *The diagnosis of Autism Spectrum Disorder without Intellectual Disability, Social-*

---

[23] Doc. 31-1 at 5.

*Communication Severity score of 1 ("requiring support") is*
*appropriate for Mr. Huseth.*[24]

Huseth's developmental delays were identified by the age of 2.  He was non-verbal, made

no eye contact, engaged in repetitive behaviors, displayed limited social engagement, and had

significant language delays.  Huseth was placed in a special education preschool class for

children with developmental disorders.  He received speech therapy because he did not speak,

but by second grade it was determined that he could read.

When Huseth began seeing a psychologist, he was given other diagnoses.  At the age of

19, he was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Asperger's

Disorder (now ASD),[25] as well as Social Phobia and depression.  Following these diagnoses,

Huseth commenced mental health therapy.  Huseth received such services from 2005 to 2013 but

described the therapy as not productive, until he started group and individual therapy sessions

with Ms. Dettmer in 2013.

The government points to Huseth's high IQ, the fact that he attended college, and the fact

that he can drive a car as evidence that his ASD is not severe.  Dr. Loftin scored Huseth's Full

Scale IQ at 123 and noted that he has good vocabulary.  But, despite his high IQ, Huseth is

severely impaired and, in many areas, functions at the level of an 8-year-old.  As Dr. Loftin

notes, intelligence is no hedge against severe impairment of adaptive functional ability.  Huseth

drives a car, but his parents have to manage oil changes, repairs, and maintenance.  Huseth

excelled at math and majored in civil engineering, but he dropped out of college because he

---

[24] *Id.* at 14.

[25] The DSM-5 folded Asperger's Disorder into the umbrella diagnosis of ASD.  *See* Am. Psychiatric Ass'n, *supra* note 15, at 51 ("Individuals with a well-established DSM-IV diagnosis of autistic disorder, Asperger's disorder or pervasive developmental disorder not otherwise specified should be given the diagnosis of autism spectrum disorder.").

struggled with higher-level, collaborative projects that required him to interact with others, and he could not tolerate living with a roommate or on campus.

After Huseth dropped out of college, he trained to be an electrician, at his father's urging. But he has been unable to maintain employment.  He is bullied by peers and struggles to interact with others.  Ms. Dettmer attributed Huseth's difficulties at work to his "concrete way of thinking."[26] She described one example—the foreman at a previous job told Huseth to "holler at me when you are done."[27]  Huseth interpreted that literally and hollered or yelled at the foreman across the job site to inform him the job was done.  Ms. Dettmer explained that she has worked with Huseth "to help him understand and respond appropriately to peer and supervisor interactions."[28]

Although Huseth lived in an apartment at the time of the search warrant, that was short-lived.  For all but two of his adult years, he has resided with his parents.  Huseth's parents, who by all accounts provide a loving and highly supportive environment for him, have described his challenges with certain activities of daily living.  For example, they have to repeatedly show him how to address an envelope.  And they recalled that after a recent dental appointment, Huseth told them he did not realize that he was supposed to brush all the surfaces of his teeth; he thought he only needed to brush the chewing surfaces.

Huseth has never been married, has no children, and has never been in a long-term romantic relationship.  He has few or no friends; he describes his "best friend" as a woman from California he met online playing World of Warcraft, whom he has never seen in person.  In

---

[26] Doc. 31-3 at 1.

[27] *Id.*

[28] *Id.*

social interactions, Huseth continues to be bullied by others and taken advantage of by those who detect his naïveté and vulnerability.

Dr. Loftin notes that "Huseth can appear very odd."[29]  He has a history of intense preoccupations that interfere with social engagement and a history of insistence on verbal rituals and repetitive behaviors.  Dr. Loftin found that "his mindblindness further complicates the picture because he is not aware of how unusual his behavior can seem to others."[30]  This, she explained, is a cornerstone of ASD.  According to Dr. Loftin, "[t]he Theory of the Mind," a "dominant theor[y] in ASD," "asserts that 'mindblindness' is at the root of social difficulties of this disorder, meaning that people with ASD have difficulty attributing mental states (beliefs, desires, and intentions) to others, and also have difficulty understanding that others have internal states that differ from one's own."[31]  As a consequence, people with ASD have delayed or no development of certain social capabilities, and more advanced capabilities fail to develop at all.

### 2.      Huseth Did Not Fully Appreciate the Wrongfulness and Harm

Huseth's motion for variance is based in part on his failure to fully appreciate the wrongfulness of possessing child pornography and the harm done to the children depicted in the pornography.  To be sure, Huseth knowingly and intentionally possessed child pornography and had the *mens rea* rendering him guilty of the offense.  And the Court recognizes that a *departure* based on diminished capacity is forbidden under U.S.S.G. § 5K2.13 for crimes involving child pornography.  But in considering whether a variance is appropriate, the Court may consider Huseth's cognitive impairments and deficits to the extent that he did not fully appreciate the wrongfulness of his actions.

---

[29] Doc. 31-1 at 15.

[30] *Id.*

[31] *Id.*

There is substantial evidence that, while Huseth's ASD did not *cause* him to possess child pornography, his ASD impaired his ability to understand why it was wrongful and that children were gravely harmed in the production of the pornography. As Ms. Dettmer explained, Huseth is "extremely naïve and like other individuals with ASD he demonstrates difficulty with taking the perspective of others and lacks social awareness of routine social conventions."[32] Ms. Dettmer described Huseth's initial lack of understanding about what he had done wrong: "He became quite upset in the clinical office and stated 'I just viewed it, I didn't hurt them.'"[33] Similarly, when Dr. Spence and Dr. Imhof interviewed him, Huseth said, "I always thought it's wrong like in the long run to do that to a kid in real life and I didn't really think it was wrong to look at it. . . . I guess I compare it to a Peeping Tom or something."[34] Ms. Dettmer noted that Huseth would not fully appreciate that "a child depicted in a sexual pose or having sexual contact with another child or an adult was the subject of abusive criminal conduct, or that the child did not want to be there. He would most likely also miss facial expressions that might make that unambiguous for typical viewers."[35]

Ms. Dettmer and Dr. Loftin both spoke to this concept of "mindblindness" in Huseth and his impaired ability to recognize or understand the internal mental states of others. It is this impairment that distinguishes neurotypical people, who from years of social interaction—and reading and intuiting the behavior of others—develop an awareness of community standards that child pornography is wrong because of the harm it causes children. Neurotypical people's ability to interact, infer, and intuit allows them to understand that child pornography is harmful to

---

[32] Doc. 31-3 at 3.

[33] *Id.*

[34] Huseth Ex. A at 41. All citations prefaced with "Ex." refer to exhibits that were admitted at the June 8, 2021 evidentiary hearing.

[35] Doc. 31-3 at 3.

children and why it is an abomination under societal standards, without anyone expressly telling them so.  But Huseth's ability to intuit unexpressed but implicit societal rules is impaired.  In fact, Dr. Loftin found that Huseth scored at an age equivalent of 8 years and 8 months in "making inferences" on a social problem-solving evaluation.[36]

Huseth generally understood that it was wrong to hurt children.  He told Dr. Spence and Dr. Imhof that he would delete child pornography "where the girl[] [wa]s obviously getting hurt . . . or if the girl . . . seemed upset."[37]  But Huseth then stated, "You know, actually, I don't think I came across that too often but sometimes."[38]  This illustrates Huseth's impaired ability to read the facial expressions and emotional states of the children and to understand that *all* children depicted in child pornography are being hurt.

Ms. Dettmer further noted that a neurotypical person would also understand that people who view child pornography are encouraging its producers, but Huseth's "appreciation of that kind of connection is impaired, not for lack of values, but for lack of normal functioning of his brain."[39]

The government argues that Huseth demonstrated he understood the gravity of his conduct when he asked Agent Craig Enloe what kind of prison sentence he was looking at.  During the execution of the search warrant, Agent Enloe interviewed Huseth in a car parked outside Huseth's apartment.  Agent Enloe recorded the interview, and the Court has listened to it.  Huseth asked about a prison sentence only after agents identified themselves as law enforcement, produced a search warrant, swarmed his apartment, and began seizing his computer and related

---

[36] Doc. 31-1 at 13.

[37] Huseth Ex. A at 33.

[38] *Id.*

[39] Doc. 31-3 at 3.

items.  And Huseth raised this question well into the interview, after Agent Enloe had asked him numerous questions about the type and quantity of child pornography he possessed, how he obtained it, whether he had distributed it, and whether he had sexual contact with children. Huseth's question in no way evidences that he fully appreciated the wrongfulness of his actions.

The government points to other evidence that, it argues, indicates Huseth appreciated the wrongfulness of his actions.  For instance, Huseth told agents that he had not disclosed to his therapist that he viewed child pornography because he was too embarrassed to tell her.  But Ms. Dettmer advised that "Huseth had not discussed the use of pornography in *any* format with [her] prior to his computer being taken by police.  Since this has taken place, he has processed his experiences and use of both adult and child porn in therapy sessions."[40]  The government misstates the record when it argues that Huseth had discussed adult pornography but not child pornography with his therapist.

The government also argues that, despite Huseth's parents' account that Huseth discussed his short-term sexual encounters with them in embarrassingly graphic detail, Huseth did not tell them about viewing child pornography.  But the record does not indicate that Huseth's inappropriately graphic candor with his parents occurred before he was apprehended.  Instead, the evidence is that Huseth's parents had not talked much to Huseth about any sexual matters as he was growing up.  The Court simply will not assume from Huseth's silence that he fully appreciated the wrongfulness of viewing child pornography.  Huseth's parents never expressly told him that viewing child pornography was wrong and why, and Huseth's ASD impaired his ability to intuit the unspoken prohibition of child pornography.

---

[40] *Id.* at 2 (emphasis added).

The government also suggests that Huseth told Agent Enloe that he had Asperger's Syndrome as an excuse for his behavior, which indicates he understood the wrongfulness of his conduct.  But having reviewed Agent Enloe's recorded interview of Huseth, the Court is not convinced that Huseth was attempting to excuse or justify his conduct.  Rather, Huseth mentioned that he had Asperger's Syndrome in the context of telling Agent Enloe that he had a therapist and that he had not told her that he possessed child pornography.

Further, the government suggests that Huseth minimized the frequency that he viewed child versus adult pornography, indicating he understood the wrongfulness of his conduct.  When pressed by Dr. Imhof, Huseth stated that he spent half to two-thirds of the time he viewed pornography looking at adult pornography and that, of the time he spent viewing child pornography, the majority was spent viewing materials depicting teenagers, not prepubescent children.  But there is no evidence that Huseth understated the relative time he spent viewing child pornography, and the Court declines to speculate that Huseth was minimizing.

It also bears noting that Agent Enloe could not have appreciated the extent of Huseth's cognitive deficits while interviewing him.  Agent Enloe interpreted Huseth's answers to his questions through the filter of how a neurotypical person would respond.  But, as Dr. Loftin and Ms. Dettmer repeatedly noted, Huseth has significant cognitive deficits that affect his ability to communicate effectively.

Dr. George Athey, Jr., Ph.D, ABPP, is a neuropsychologist retained by Huseth to evaluate his sexual behavior and sexual interest patterns.  Dr. Athey treats sex offenders in a clinical practice, after 27 years of such practice at the famed Menniger Clinic.  Dr. Athey was not retained to evaluate Huseth's ASD.  Nonetheless, in the course of his evaluation, Dr. Athey observed that Huseth "evidences clear deficits in cognitive ability to express his emotional

experience and to maintain a consistent context for responding to questions about his sexual experience in particular that could allow him to appreciate what other people would think he is communicating regarding his sexual attraction and behavioral intent towards children."[41]

Dr. Spence and Dr. Imhof submitted a joint report that focused solely on the question of Huseth's sexual behavior and interests.[42]  Dr. Imhof is a clinical psychologist who specializes in treating sex offenders, including cases involving child pornography, now in private practice after many years of directing programs for state and federal sex offenders.  Dr. Spence's and Dr. Imhof's joint report acknowledges that Huseth has ASD but evaluates his behavior and interests without regard to his ASD, and without any apparent appreciation that their interview (and Agent Enloe's interview) should take account of Huseth's cognitive deficits and ability to communicate effectively.  To the contrary, and surprisingly given Dr. Spence's expertise in ASD, their report characterizes Huseth as having "deficits in the general self-regulation domain including poor cognitive problem solving in that he describes he does not consider the consequences of his actions before making a decision."[43] And while the report notes that "Huseth struggles to understand the impact of his viewing pornography depicting minors on the victims,"[44] it characterizes this as "[him] demonstrat[ing] [a] lack of concern for others."[45]

Given Dr. Spence's and Dr. Imhof's focus on the question of Huseth's sexual behavior and sexual interests, and their disregard for Huseth's ASD, the Court gives little weight to their

---

[41] Doc. 31-2 at 9.

[42] *See* Gov. Ex. 50.

[43] *Id.* at 8.

[44] *Id*.

[45] *Id*.

characterization of Huseth to the extent it relates to whether he fully appreciated the

wrongfulness of viewing child pornography.

Huseth's ASD impaired his ability to see the harm in viewing child pornography.  As Dr.

Loftin explained:

> [M]ost typical peers acquire information about sexual norms and
> expectations from peers and media.  No one explicitly says that it
> is illegal to look at sexual images of children.  Individuals with
> ASD do not acquire information from their peers and the media in
> the same way.  Even the most basic information must be taught in
> an explicit and clear fashion for people with ASD.  If someone
> with ASD is not told, for example, that looking at images of a
> person below the age of consent or onset of puberty is wrong and
> can indirectly cause harm to other children by creating a demand
> for the product, he or she may not know that it is not acceptable.
> Particularly for a person with ASD who, like Mr. Huseth, has
> significant deficits in inferencing, it would be nearly impossible to
> comprehend this information without being explicitly told.  That is,
> he would not understand that a child is unhappy being
> photographed because he is not unhappy to see it.[46]

In short, although Huseth's ASD did not cause his behavior, his ASD substantially

contributed to the commission of the offense because it impaired his ability to fully understand

that viewing child pornography is wrong and why it is wrong.  This inability to intuit and infer,

coupled with the fact he never received explicit instructions on the topic, contributed to his

commission of this offense.  Further, Huseth lacked the ability to exercise the power of reason to

appreciate that every child depicted in child pornography has been raped, abused, and irreparably

harmed.

### C.      Promote Respect for the Law

During the three years since Huseth was charged with this offense, he has been on pretrial

release and has been compliant with the terms of his bond supervision.  He has followed the rules

---

[46] Doc. 31-1 at 14–15.

and continued to see Ms. Dettmer for therapy.  Ms. Dettmer stated, "He now understands the reasoning behind the prohibition and the victimization that is depicted.  He feels terrible that he did what he did, now that he understands why it is wrong.  He now understands the rules."[47]  She explained that people with ASD "follow the rules once they understand them," and "this is very true in the case of [Huseth]."[48]  "During my work with Mr. Huseth," she added, "he has been observed during social skills training to follow rules to a fault."[49]

Dr. Loftin and Dr. Athey also noted that people with ASD are "rule followers," once they know the rules.  Dr. Imhof agreed, though he testified that he has had some sex offenders with ASD who recidivated.[50]  Huseth's parents provided an example of his firm allegiance to rules once he knows them.  During driver's education, Huseth was taught to stop the car well before the intersection.  Huseth is so compliant with this rule that he typically stops an unusually long distance from the intersection, sometimes impeding his ability to see oncoming traffic before he slowly inches forward.

A prison sentence is often necessary to promote respect for the law.  But Huseth has demonstrated his respect for the law through a prolonged, three-year period of abiding by his many conditions of pretrial release, most of which will continue during his future term of supervision.

### D.    Afford Adequate Deterrence to Criminal Conduct

Preventing the future abuse of children through the manufacture, distribution, and possession of child pornography by generally deterring such conduct is always an important

---

[47] Doc. 31-3 at 3.

[48] *Id.* at 4.

[49] *Id.*

[50] As discussed *infra*, considering the nature of the offense and Huseth's history and characteristics, he presents a low risk of recidivism.

factor in sentencing.  Congress, the Supreme Court, and the Sentencing Commission have long recognized the importance of general deterrence in considering an appropriate sentence.[51]

With respect to Huseth's specific deterrence, for the reasons addressed above, the Court concludes that a prison sentence is not necessary in this case to either promote respect for the law or to afford adequate deterrence to criminal conduct.

### E.    Protect the Public from Further Crimes of the Defendant

The parties offered conflicting opinions about whether Huseth has Pedophilic Disorder. Dr. Imhof and Dr. Spence opined that Huseth qualifies for a diagnosis of "Pedophilic Disorder, non-exclusive type, sexually attracted to females" based on their opinion that he is attracted to children and uses child pornography to cope with depression.[52]  They found that Huseth met the three criteria for this diagnosis:

> [R]ecurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child (generally age 13 years or younger) for a duration of six months (Criterion A); the individual has acted on these sexual urges or the sexual urges or fantasies have caused marked distress or interpersonal difficulty (Criterion B); and the person is at least sixteen years of age and at least five years older than the child or children (Criterion C).[53]

There is no dispute that Huseth meets Criterion A and Criterion C.  But Criterion B requires that the person has acted on the sexual urges or that the sexual urges or fantasies have caused marked distress or interpersonal difficulty.  Huseth has not acted on any sexual urges involving children, and there is no evidence that Huseth's urges or fantasies have caused him marked distress or

---

[51] *Osbourne v. Ohio*, 495 U.S. 102, 109–10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").

[52] Gov. Ex. 50 at 9.

[53] *Id*.

interpersonal difficulty.  He had not told his therapist, parents, or anyone about viewing child pornography until he was apprehended.  There is no evidence that it has affected his functioning or his relationships, or otherwise caused him distress.

Notably, Dr. Imhof found that Huseth meets Criterion B because he suffered distress and interpersonal difficulty when he was apprehended and charged with possession of child pornography.  Following this logic, had Huseth not been apprehended, he would not qualify for the diagnosis of Pedophilic Disorder.  That Dr. Imhof's diagnosis hinges on the fact that Huseth's conduct was detected is nonsensical.  Further, Dr. Spence's and Dr. Imhof's report and testimony indicates that their opinion that Huseth has Pedophilic Disorder also relies in part on certain statements Huseth "reportedly" made to the agents who interviewed him.  But Dr. Spence's and Dr. Imhof's account of some of those statements is inaccurate or takes them out of context.

Dr. Loftin, Dr. Athey, and Ms. Dettmer all opine that Huseth is not sexually attracted to children and does not have Pedophilic Disorder.  Dr. Athey evaluated Huseth with a focus on identification of Huseth's "patterns of sexual interest and understanding the basis for these interests from the perspective of the history of his development of sexual experience over time and the deficits in his functioning in development of relationships."[54]  To that end, Dr. Athey reviewed Dr. Loftin's psychological evaluation report, interviewed Huseth, and administered the MMPI-2-RF test and the Abel Assessment for Sexual Interest ("AASI-3").[55]  Dr. Athey noted that the AASI-3 is an empirically validated system for assessing sexual interest among

_____

[54] Doc. 31-2 at 1.

[55] Part of the AASI-3 administered by Dr. Athey included data from another patient who was apparently assigned the same client ID as Huseth.  But this did not invalidate Dr. Athey's evaluation, because he could ascertain which data applied to Huseth, and he did not consider the mistakenly included data from the other patient.

neurotypical persons.  Dr. Athey evaluated the test results and observed that Huseth has

significant communication deficits.  He also noted significant cognitive problems in memory and

concentration and "discontinuities in thinking."[56]  Dr. Athey also reviewed the MMPI-2 tests

administered to Huseth in 2014 and 2015, including the checking of validity scales, which might

bear on the weight to give to the AASI-3.  Dr. Athey found the MMPI-2 test results to be valid.

Dr. Athey concluded that Huseth does not have Pedophilic Disorder and explained:

> It is my opinion within a reasonable degree of psychological
> certainty that [Huseth] does not pose risk for progressing beyond
> his viewing of child images into approaching children for sexual
> gratification.  He requires ongoing treatment for his autism
> spectrum disorder condition to understand the source of his
> abnormal viewing practices and how to interact with adult females
> in order to have more satisfying emotional relationships with
> them.[57]

Dr. Imhof took issue with Dr. Athey's report primarily because of the data on the Visual

Reaction Time ("VRT") part of the test, which showed Huseth's viewing time of female adults,

adolescents, 6–13-year-olds, and children 5-years-old and younger signified sexual interest in

children.

Dr. Athey found that based on visual reaction time alone, the test suggested a problematic

interest in the 6–13 age group, but not in any younger age group.  But Dr. Athey did not place as

much weight on the VRT data as Dr. Imhof.  Dr. Athey explained that "the average ratings for

age group fell within a region of disgust,"[58] and stressed that "[i]t is important to recall that the

arousal ratings in this portion of the protocol refer to the degree of arousal experienced when

---

[56] *Id.* at 3.

[57] *Id.* at 10.

[58] Doc. 31-2 at 8–9.

attempting to fantasize about actual contact with the person in the slide."[59]  Dr. Athey found that Huseth's "arousal by certain partial aspects of child pornographic images does not equate to his response to 'real' people"; rather, "it is an attraction to a visual depiction of his own experience of the onset of sexual arousal in childhood and the privacy of his early experience of it, not an attraction to or arousal by a female of that age."[60]  Dr. Athey also noted that Huseth's romantic relationships have all been with adult women, and as Huseth has aged, so have the ages of the adult women he has pursued.  This is consistent with Ms. Dettmer's opinion that "Erik does not have any sexual interest in underage females."[61]

When Dr. Spence and Dr. Imhof interviewed Huseth, he told them that when he viewed pornography and masturbated, he did not usually think about having sex with the person on the screen: "It's kind of weird.  Like when I -- my computer it's really removed."[62]  He described child pornography as "just kind of an extreme form of porn because I wouldn't really do it in real life. . . .  [O]n a computer screen it kind of seems good, but if I imagined myself doing that in real life, it's pretty bizarre."[63]  Huseth described having fantasies sometimes about the "teenage girls" he viewed, but "it would be a little freaky with the like children because it's just too much with the kids.  Like it's off-putting to think about in real life."[64]  Huseth said he never had sexual fantasies about children in real life.  He also said that he had no sexual attraction to his former girlfriend's six-year-old daughter, despite being around the child for several days at a time and sometimes babysitting while the mother was at work during the two to three months that he dated

---

[59] *Id.* at 9.

[60] *Id.*

[61] Doc. 31-3 at 3.

[62] Huseth Ex. A at 44.

[63] *Id.* at 45.

[64] *Id.* at 45-46.

the mother.  Huseth also disclaimed feeling more comfortable around children or wanting friendships with children.

Dr. Spence and Dr. Imhof gave great weight to Huseth's description of his attraction to child pornography and concluded that he was sexually attracted to children.  But Huseth actually said he would look at child pornography because he "just liked what it looked like physically."[65] It was Dr. Imhof who then suggested to Huseth that he downloaded the image "if [he] found that *individual* attractive."[66]  But Huseth's words could just as easily be interpreted as liking the scene, rather than being attracted to the individual child in the scene.

As noted above, Dr. Athey concluded that whatever interest Huseth showed in child pornography was not by virtue of any sexual interest in children; rather, Huseth was attracted to images that resonated with his earliest experience of sexual arousal in childhood.  Dr. Athey thus ruled out Pedophilic Disorder.  The Court gives more weight to Dr. Athey's assessment because he actually administered the test to Huseth.

The Court heard a battle of the experts on another related issue.  Dr. Loftin opined that Huseth's "mindblindness," which is a symptom of ASD, "can produce a phenomenon of *counterfeit deviance*, in which he may appear to fit a particular profile of deviant behavior (i.e., paraphilia) when, in fact, he is displaying symptoms of ASD."[67]  Dr. Spence challenged Dr. Loftin's opinion, pointing to research that limits the differential diagnosis of counterfeit deviance

---

[65] *Id.* at 38.

[66] *Id.* at 39 (emphasis added).

[67] Doc. 31-1 at 15; *see also* Denise C. Kellaher, *Sexual Behavior and Autism Spectrum Disorders: an Update and Discussion*, 17 Current Psychiatry Reps. 25 (2015) ("Counterfeit deviance characterizes sexual behavior that may appear to arise from a paraphilia but instead it originates from a lack of sexual knowledge and experience and from poor social skills.").

to prisoners or mental patients who contrive sexually deviant behavior for attention-seeking purposes.  The Court need not resolve this difference of opinion.

To be sure, the Court gives more credence to Dr. Athey's opinion that Huseth does not have Pedophilic Disorder.  But for purposes of evaluating the important consideration of protecting the public from further crimes, the Court finds more persuasive that Dr. Loftin, Dr. Athey, Dr. Imhof, and Dr. Spence all agree that a diagnosis of Pedophilic Disorder is not predictive of the likelihood of recidivism.  And there is no dispute that for Huseth—convicted of non-production possession of child pornography, with no evidence of sexual contact with children—the likelihood of recidivism is very low.

Indeed, the Sentencing Commission's latest child pornography report includes statistics on this very question.[68]  The Sentencing Commission analyzed known recidivism rates of federal non-production child pornography offenders who had either distributed, received, or possessed child pornography.  The study tracked for a three-year period all such offenders who were released from prison or placed on probation in 2015.[69]  Known recidivism was defined as any of the following arrest events: an arrest that led to a felony or misdemeanor qualifying conviction; an arrest that led to no evidence of acquittal or dismissal; or a reported technical violation of conditions of probation or supervised release that led to an arrest or revocation.[70]  The study analyzed "overall recidivism" and "sexual recidivism" rates (contact or no-contact sex offenses).[71]

---

[68] *See* U.S. Sent'g Comm'n, *supra* note 1.

[69] *Id.* at 62–63.

[70] *Id.* at 63.

[71] *Id.*

The study found an overall recidivism rate of 27.6% among the non-production child pornography offenders tracked: 16% were arrested for a crime that was not a sex offense or related to their status as a sex offender; the sexual recidivism rate was 4.3%, with only 1.3% of offenders arrested for a contact sex offense; and 7.3% of offenders were arrested or had their term of supervised release revoked for failing to register as a sex offender.[72]  Importantly, this study did not distinguish between those convicted of distribution, receipt, or possession, the latter of which carries a lower base offense level.  This low recidivism rate comports with the expert testimony in this case.

The Court thus concludes that Huseth does not have Pedophilic Disorder, but even if he does, the likelihood of recidivism is exceedingly low.  Furthermore, as discussed below, the conditions the Court imposes for Huseth's term of supervision include a treatment plan recommended by Dr. Imhof and Dr. Spence, based on their opinion that Huseth has Pedophilic Disorder.

### F.        Avoid Unwarranted Sentencing Disparities

It is not unusual for courts to vary downward from the applicable Guidelines range in sentencing defendants like Huseth, who are convicted of non-production possession of child pornography.  The Sentencing Commission reports that in FY 2019, less than one-third of offenders sentenced for non-production child pornography offenses received a sentence within the Guidelines range; the majority (59%) received a downward variance.[73]

And for defendants like Huseth, who were convicted of non-production possession of child pornography, 81.5% received a downward variance in FY 2019.[74]  The majority of

---

[72] *Id.* at 65.

[73] *Id.* at 5.

[74] *Id.* at 55.

defendants convicted of non-production possession of child pornography had a Guidelines range of 78 to 97 months, and the average sentence imposed was 47 months, although there were considerable differences in how these similarly situated defendants were sentenced.[75]  For non-production possession offenders who received a two-level enhancement for distribution, the majority had a Guidelines range of 97 to 121 months, and the average sentence imposed was 57 months, although there were again considerable differences in how these similarly situated possession offenders were sentenced.[76]

To be sure, 99% of defendants convicted of non-production distribution, receipt, or possession of child pornography received a prison sentence in FY 2019.[77]  But, noting that most of these defendants received a downward variance, the Sentencing Commission explained that "the long[-]term trend shows that most courts believe § 2G2.2 is generally too severe and does not appropriately measure offender culpability in the *typical* non-production child pornography case."[78]  And although 99% of offenders in all non-production categories receive a prison sentence, obviously 1% do not receive a custodial sentence.  In this Court's view, despite the temptation to vary downward but still impose a prison sentence given that statistic, an intellectually honest analysis compels a noncustodial sentence in this case.  As it must, the Court has considered all the § 3553(a) factors, including the history and characteristics of Huseth, while not giving undue weight to that factor alone.

The parties have briefed these issues extensively, including citations to numerous child pornography cases to either justify a variance or a Guidelines sentence.  But in *United States v.*

---

[75] *Id.* at 54.

[76] *Id.* at 57.

[77] *Id.* at 20.

[78] *Id.* at 22. (emphasis added).

*Booker*,[79] the Supreme Court counseled that under the advisory Guidelines system, courts should "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary."[80] While statistics are informative and enlightening, in the final analysis, the Court is to fashion a sentence for the individual defendant that duly considers all the § 3553(a) factors, including those that are unique to the individual defendant.

The Court declines to consider the sentences in the many cases cited by the parties for any purpose other than a recognition that there are sentencing disparities for defendants convicted of non-production child pornography cases. In the legion of cases cited by the parties, there were differences in the nature and circumstances of the offense, such as sexual contact, non-sexual contact, possession, distribution, and/or receipt. There were differences in the history and characteristics of the defendant, and differences across other § 3553(a) factors, including whether any sentencing disparity was warranted. It is also clear that in many of those cases, the judge's decision was not based on an extensive record of the defendant's life-long cognitive impairments, or an extensive record of expert analysis and opinions that this Court enjoys.

### G.   Just Punishment and the Need to Provide Training, Care, or Treatment

Just punishment necessarily considers both the seriousness of the offense and what sentence would provide just punishment to this individual defendant. The experts all agree that Huseth is uniquely vulnerable in a prison population, given his deficits in social adaptive functioning and social immaturity. One researcher has noted that while estimates vary by study,

---

[79] 543 U.S. 220 (2005).

[80] *Id.* at 264–265.

reported instances of bullying among individuals with ASD in the general prison population range from 29% to 94%.[81]

As has been the case in his community and throughout his life, Huseth is vulnerable to being manipulated and used by others.  He operates as an eight-year-old in many aspects of social adaptation and maturity.  This, coupled with his sex offender conviction, makes him particularly vulnerable in a prison setting.  This factor is not determinative, nor should it be.  But it is a factor the Court necessarily considers.

With a sex offender conviction, Huseth is ineligible for sentencing to a minimum-security facility.[82]  While the Court can recommend that this sex offender provision be waived, the Bureau of Prisons ("BOP") is under no obligation to waive it.  The Court thus considers that if incarcerated, Huseth may be designated to a medium-security facility where the population may render him more vulnerable than in a minimum-security facility.

Ms. Dettmer and the other experts agree that Huseth needs treatment.  Where they differ is whether he can receive adequate treatment through BOP programming.  Dr. Imhof has vast experience with the BOP programming and opined that Huseth can receive adequate sex offender treatment there.  Dr. Imhof and Dr. Spence pointed to the Skills Program offered by the BOP, which helps developmentally disabled persons survive in the difficult prison culture, including those with ASD.  The Skills Program, however, has not been adapted to those with ASD and their unique needs.  And there is no therapy specific to ASD available in the BOP.

---

[81] Gary Mesibov & Melissa Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *in* Caught in the Web of the Criminal Justice System: Autism, Other Developmental Disabilities, and Non-Contact Sex Offenses 64, 70–71 (Lawrence A. Dubin & Emily Horowitz eds., 2017).

[82] *See* BOP Program Statement 5100.08.

Ms. Dettmer, with the benefit of having treated Huseth for his ASD since 2013, recommends that Huseth continue to work with a mental health professional who specializes in ASD, as his ASD causes him severe, debilitating anxiety, and his difficulty in interacting with others causes him to struggle with activities of daily living.  Ms. Dettmer opines that Huseth needs "intervention unlike typical sex offender's rehabilitation programs.  He needs to be offered therapy consisting of psychosexual education that informs in a clear, concrete fashion what the 'rules' are for safe, and legal sexual interaction as well as what specific sexual interactions to avoid."[83]  This is borne out by his inappropriate romantic relationship in the early months of 2018 with a mother of a six-year-old daughter.  Ms. Dettmer further opines that Huseth also needs "ongoing mental health counseling separate from the psychosexual education in order to maintain stability of his anxiety."[84]

Dr. Loftin agrees that Huseth would not benefit from the usual sexual offender rehabilitation program.[85]  Instead, he needs "instruction in sexuality from someone specialized in teaching people with ASD, along with increased opportunities for social skill development and interaction."[86]  Dr. Loftin opines that a trained mental health professional can provide the concrete, explicit instruction Huseth needs on how to avoid illegal websites and images.  Dr. Loftin further opines that Huseth needs continued individual therapy to address social-emotional deficits, with a focus on "development of perspective taking and theory of mind skills."[87]

---

[83] Doc. 31-3 at 4.

[84] *Id.*

[85] Doc. 31-1 at 16.

[86] *Id.*

[87] *Id.*

In fact, the universal view among the experts is that Huseth would benefit *most* from treatment, and that any risk of recidivism can be more appropriately addressed through treatment than incarceration. Indeed, the special conditions of supervision recommended in the Presentence Investigation Report address these needs in a manner the medical professionals find acceptable and appropriate. These conditions include a computer and internet monitoring program that will preclude Huseth's access to adult or child pornography or media that would allow interaction with those engaged in such activities. The conditions also include participation in mental health treatment, which may include psychological counseling and prescribed medication, and a condition allowing the U.S. Probation Office to search Huseth's person, house, residence, vehicles, place of employment or business, and any property under his control, when based upon reasonable suspicion.

And, consistent with the experts' recommendations, the Court will modify the special condition in paragraph 146 of the Presentence Investigation Report to read: "You must participate in therapy targeted at ASD, such as cognitive-behavioral, therapist-led therapy," as described in Dr. Loftin's report.

The conditions of supervision typically include obtaining "a current psychosexual and/or mental health evaluation" and, "if recommended by any such evaluation," participating "in a mental health treatment program and/or sex offender treatment program."[88] If referred to a sex offender treatment program, the offender is required to comply with any and all monitoring and evaluation modalities, including polygraph and visual reaction testing. But the Court will modify this condition.

---

[88] Doc. 20 ¶ 146.

At Huseth's request, Bruce Cappo, Ph.D., ABPP, a licensed psychologist with Clinical Associates, P.A. ("Clinical Associates") submitted a letter dated June 3, 2021, detailing his group's ability to provide treatment for Huseth in accordance with the treatment recommendations of Dr. Imhof and Dr. Spence.[89]  Dr. Cappo stated that he had reviewed Dr. Imhof's and Dr. Spence's joint report, understood that they had diagnosed Huseth with Pedophilic Disorder, Non-Exclusive Type, Sexually Attracted to Females, as well as Unspecified Depressive Disorder, and that Huseth also had a historical diagnosis of ASD.  Dr. Cappo's letter detailed each of their recommendations and concluded that Clinical Associates can provide such a treatment program.  Notably, Clinical Associates has been offering sex offender treatment services for 29 years, and it has "a deep bench of providers who hold clinical status with the Association for the Treatment of Sexual Abusers (ATSA)."[90]  Its providers have presented at ATSA international conferences and published in the ATSA journal.  Clinical Associates has also held contracts with the U.S. Probation and Parole Offices as well as the BOP to provide sex offender evaluation and treatment for more than 20 years.  Clinical Associates has treated more than 1,500 sex offenders since 2010, created a transitional treatment program for sexual predators in Kansas, and provided in-facility and outpatient evaluation and treatment services for the State of Kansas for 9 years.[91]

Dr. Imhof testified that Dr. Cappo's letter merely regurgitates his recommendations and provides no specific treatment plan or assurance to him that it can deliver treatment based on his recommendations.  But the fact that Dr. Imhof, who does not practice in Kansas, is unfamiliar with Clinical Associates and its providers' long record of treating federal and Kansas sex

---

[89] Huseth Ex. B; Gov. Ex. 50 at 10–11.

[90] Huseth Ex. B.

[91] *Id.*

offenders does not warrant this Court dismissing their expertise or stated ability to provide a treatment plan that comports with Huseth's needs and the experts' recommendations.

Further, the proposed treatment plan is based on Dr. Spence's and Dr. Imhof's opinion that Huseth has Pedophilic Disorder, despite the contrary opinions of the other experts. In that sense, the proposed treatment plan, which the Court will adopt and incorporate into the conditions of probation, is more than adequate to address the need for therapeutic treatment, the low risk of recidivism, and the need to protect the public from Huseth's further crimes.

### H. Restitution

The parties have stipulated and agreed to the identity of the victims and the amount of restitution to be paid to each one of them. So, this is not an issue at sentencing.

## III. Conclusion

The Supreme Court has firmly instructed that the Sentencing Guidelines are advisory and that the sentencing court "may not presume that the Guidelines range is reasonable" but "must make an individualized assessment based on the facts presented."[92] The court must "frame[] its final determination in line with §3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)."[93] This Court has considered all of the factors it must consider under section § 3553(a). While this Court has seriously considered the history and characteristics of this defendant, as it must, this Court has not focused on this factor exclusively nor failed to seriously consider all of the § 3553(a) factors. And the Court finds that a downward variance to a sentence

---

[92] *Gall v. United States*, 552 U.S. 38, 50 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)).

[93] *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

of probation is warranted.  The Court will entertain any final arguments of counsel, hear from

Huseth, and impose a final sentence at the sentencing hearing.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Erik. M. Huseth's

Motion for Downard Variance (Doc. 31) is **granted**.  The Court will be in contact with the

parties forthwith to schedule a sentencing date.

**IT IS SO ORDERED.**

Dated: October 22, 2021

<div style="margin-left: 40%;">

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

</div>